**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JAMES HYRE**<br><br>**and**<br><br>**HYRE & ASSOCIATES, LLC**<br>**D/B/A HYRE PERSONAL**<br>**WEALTH ADVISORS**<br><br>**Plaintiffs.**<br><br>**v.**<br><br>**MARINER, LLC**<br>**Serve Registered Agent:**<br>**Corporation Service Company**<br>**1100 S.W. Wanamaker Rd., Suite 103**<br>**Topeka, Kansas 66604**<br><br>**Defendant.** | ) | **Case No._______________**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

COMES NOW, Plaintiffs James Hyre and Hyre & Associates, LLC d/b/a Hyre Personal Wealth Advisors, by and through their undersigned counsel, and for their causes of action against Defendant Mariner, LLC, state and allege as follows:

**PARTIES**

1. Plaintiff James Hyre ("Plaintiff Hyre") is an individual and citizen of the State of Ohio, residing at 980 Elmwood Avenue, Columbus, Ohio 43212.

2. Plaintiff Hyre & Associates, LLC d/b/a Hyre Personal Wealth Advisors ("Plaintiff HPWA") is an Ohio based limited liability company, with its principal place of business located at 980 Elmwood Avenue, Columbus, Ohio 43212. Plaintiff Hyre is the sole member of Plaintiff HPWA and owns all issued and outstanding membership interests of Plaintiff HPWA.

3. Defendant Mariner, LLC ("Defendant Mariner" or "Mariner") is a domestic limited liability company, with its principal place of business located at 5700 W. 112th Street, Suite 500, Overland Park, Kansas 66211. Defendant Mariner may be served with process through its registered agent, Corporation Service Company, at 1100 S.W. Wanamaker Rd. Suite 103, Topeka KS 66604.

**JURISDICTION AND VENUE**

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000.00 and Plaintiffs and Defendant are citizens of different States.

5. This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(A) and K.S.A. § 60-308(a)(1) because Defendant is a resident of the State of Kansas and is therefore subject to the general personal jurisdiction of Kansas courts. This court has general personal jurisdiction over Defendant because the State of Kansas is Defendant's state of incorporation as well as its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 118-19 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)).

6. Venue is proper in this court under 28 U.S.C. § 1391(b)(1) because Defendant is a resident of the State of Kansas. Additionally, venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Overland Park, Kansas.

**FACTS COMMON TO ALL COUNTS**

7. Plaintiff James Hyre is a personal wealth advisor that provides wealth management and investment advisory services.

8. Defendant Mariner, LLC is a financial services firm that provides inter alia wealth

management and investment advisory services.

9. Prior to the events that form the basis of this case, Plaintiff Hyre was the principal and owner of Plaintiff Hyre & Associates, LLC d/b/a Hyre Personal Wealth Advisors ("HPWA"). Plaintiff Hyre had spent the entirety of his adult life developing HPWA into a successful wealth management firm and had developed extensive positive client relationships with the individuals and entities whose assets Plaintiff Hyre and Plaintiff HPWA managed.

10. In early 2025, Plaintiff Hyre explored the potential of selling HPWA in order to continue HPWA's growth by expanding outreach to potential clients and realizing operational efficiencies through affiliation with a larger wealth management firm.

11. Plaintiff Hyre came into contact with Defendant Mariner's business development recruiter Brian O'Regan — acting within the course and scope of his employment — made several significant promises and representations to Plaintiff Hyre on behalf of Mariner in order to induce Plaintiff Hyre to sell HPWA to Mariner.

12. For example, Mariner agent and employee Brian O'Regan promised and represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy as Plaintiff had successfully done for years — particularly that Plaintiff Hyre would be permitted to take whatever actions he saw fit, including hiring personnel.

13. Mariner through its agent and employee Brian O'Regan also promised and represented that it would pay Plaintiff Hyre 35% for fees brought over by Plaintiff Hyre and HPWA and an additional 25% for fees generated from Mariner client referrals.

14. Mariner further promised and represented through its agent and employee Brian O'Regan that Plaintiff Hyre would be able to manage his client relationships in the same manner he had previously while operating HPWA.

15. Mariner further promised and represented through its agent and employee Brian O'Regan that Plaintiff Hyre's compensation from fees at Mariner would eventually increase to at least $1,500,000.00 per year after Plaintiff Hyre received his Management Incentive Program fee, as described more fully below.

16. Brian O'Regan further promised and represented that Plaintiff would be able to reduce his workload due to the support that Mariner would provide.

17. Based on Mariner's promises and representations, Plaintiff Hyre agreed to sell HPWA's assets to Mariner under an asset purchase agreement in which Mariner would purchase substantially all of Plaintiff HPWA's assets.

18. The core asset of the Transaction is and was Plaintiff Hyre and HPWA's "book of business," the highly valuable client relationships that Plaintiff Hyre and HPWA had spent years cultivating.

19. Defendant Mariner, a national wealth management firm, had and has substantially more assets and resources than HPWA.

20. In contemplating the potential transaction — and as is the customary practice in transactions of this nature in the wealth management industry — Plaintiff Hyre, Plaintiff HPWA, and Defendant Mariner agreed to a relationship whereby Plaintiff Hyre would continue to operate HPWA as he had successfully done previously and would be in charge of growing the central Ohio market.

21. Plaintiff Hyre would operate HPWA as a Mariner branch, exercising the same autonomy over his client relationships and business strategy as he had done for thirty years.

22. By selling HPWA's assets to Defendant Mariner, Plaintiff Hyre would maintain individual management of his book of business while obtaining access to Defendant Mariner's

resources as large national wealth management firm.

23. Defendant Mariner represented and promised Plaintiff Hyre that HPWA would grow substantially through Schwab and Fidelity business referrals that Defendant Mariner would provide — referrals that Mariner ultimately failed to provide or initiate despite expressly representing to the contrary.

24. Defendant Mariner would likewise benefit by receiving a portion of the fees generated by Plaintiff Hyre and HPWA's book of business, and by increasing its reach and assets under management.

25. On January 24, 2025, Plaintiff Hyre, Plaintiff HPWA, and Defendant Mariner (collectively the "Parties") signed a letter of intent ("LOI").

26. The LOI was signed on behalf of Mariner by Martin Bicknell, Mariner's Chief Executive Officer & President as well as Cheryl Bicknell, Mariner's Chief Operating Officer.

27. The LOI summarized the principal terms of a completed transaction, whereby Mariner would acquire HPWA's assets and Plaintiff Hyre would continue to operate HPWA as a Mariner employee (the "Transaction").

28. The LOI contemplated a total purchase price of up to $39,000,000.00 for Mariner's acquisition of HPWA: "Based on information we have received to date, we have valued [HPWA] at approximately $39,000,000 (the "Aggregate Purchase Price")."

29. Under the LOI, $26,000,000.00 of the total purchase price would be paid by providing Plaintiff Hyre equity shares in Defendant Mariner.

30. The remaining $13,000,000.00 would be paid three years after closing, based on three times HPWA's earnings growth.

31. Mariner employee Brian O'Regan promised and represented that starting in year

four following the Transaction (i.e., after the Management Incentive was paid), Plaintiff Hyre's compensation from fees with Mariner would be over $1,500,000.00 based on Plaintiff Hyre receiving 35% of the management fees generated by HPWA business that was originated by HPWA and 25% of management fees generated by HPWA business that was generated through Mariner referrals.

32. The LOI expressly reaffirmed several material representations that Mariner had previously made to Plaintiffs to induce the Transaction, including (1) that Mariner would facilitate expansive growth for HPWA growth through client referrals, including referrals through the Schwab Advisor Network ("SAN") and Fidelity's Wealth Advisor Solutions ("WAS"); (2) that Plaintiffs would continue to serve autonomously in advising clients and maintaining client relationships; (3) that Mariner would provide "extensive support via [Mariner's] internal Marketing, Regulatory Compliance & Legal, Finance & Billing, Operations, Human Resources and Technology teams, which furthers our goal of allowing our advisors to increase operating efficiency and focus on meeting client needs without distractions; (4) that Mariner had "significant experience in integrating new advisors, teams and offices[,]" and that Mariner "developed proven processes to help ensure the transition to Mariner is virtually seamless for clients and advisors."

33. For example, the LOI stated in part under Section 5, titled "Strategic Rationale and Plans" as follows:

> We envision that [HPWA's] client-facing team and client deliverables will remain intact. Mariner is actively engaged in day-to-day operations of all of our markets and centralizes many of the key back-office functions to support a focus on retaining clients and continued growth in our markets. [HPWA] will operate as part of Mariner with all of the tools and resources of the broader Mariner Organization in the background supporting the [HPWA] team to continue serving clients as their financial quarterback. Much like [HPWA], Mariner's goal is to continue to grow, both organically and inorganically, because we believe that a continued focus on growth allows us to create more opportunities for our clients and advisors as well

> as attract new talent to solidify the future of our organization for generations to come. Once integrated, we believe we can have a significant impact on [HPWA's] growth through the work of our dedicated business development professionals, the marketing support provided by our team at our headquarters, and especially through the access we will provide to the previously mentioned custodian referral partner programs.

34. On March 20, 2025, the Parties entered into an asset purchase agreement to memorialize the Transaction.

35. On May 1, 2025, the Parties executed an amendment to the asset purchase agreement (collectively, the "APA").

36. Under the APA, the total purchase price remained $39,000,000.00.

37. $25,000,000.00 of the transaction price would be paid to Plaintiff Hyre as equity in Mariner through class F units, and $1,000,000.00 would be paid in cash at closing.

38. The remaining $13,000,000.00 would be paid out to Plaintiff Hyre as a management incentive ("Management Incentive") based on HPWA's earnings.

39. Three years post-close, Mariner would pay Plaintiff Hyre a cash sum equal to three times HWPA's annualized earnings up to $13,000,000.00 as a Management Incentive.

40. No portion of the APA makes Plaintiff Hyre's right to receive the Management Incentive contingent on Plaintiff Hyre's continued employment.

41. Rather, the Management Incentive was expressly contemplated by the APA to be part of the purchase price for HPWA's assets: "For the avoidance of doubt, to the maximum extent permitted by law, the Management Incentive shall be treated as additional consideration for the acquired Purchased Assets[.]" This was entirely consistent with the LOI, which listed the "Aggregate Purchase Price" for the Transaction as $39,000,000.00.

42. The APA also included restrictive covenants against Plaintiff Hyre and Plaintiff HPWA including non-competition and non-solicitation provisions that purported to prohibit

Plaintiffs from competing with Mariner for two years following the payment of the Management Incentive fee (i.e., prohibits competition until May 1, 2030).

43. As part of the Transaction, Plaintiff Hyre entered into an employment relationship with Defendant Mariner.

44. As part of that employment relationship Mariner paid Plaintiff Hyre a salary of $350,000.00 — far less than Plaintiff Hyre was earning prior to the Transaction — on the understanding the Plaintiff Hyre's annual Mariner compensation would increase substantially following the payment of the Management Incentive as a result of Plaintiff Hyre receiving a portion HPWA's annual fees.

45. On May 1, 2025, the Transaction closed.

46. On May 2, 2025, Mariner required Plaintiff to execute a Non-Solicitation and Confidentiality Agreement (the "Non-Solicitation Agreement").

47. Among other things, the Non-Solicitation Agreement subjects Plaintiff Hyre to post-employment restrictive covenants for two years following his employment with Mariner.

48. One of these covenants is a customer non-solicitation provision and another is a noncompetition agreement.

49. This provision broadly prohibits Plaintiff Hyre from soliciting customers from Mariner for two years following the termination of Plaintiff Hyre's employment with Defendant Mariner in addition to the terms of the APA which prohibit Plaintiff from the same conduct until five years after closing (i.e., May 1, 2030).

50. Unfortunately, as explained below, it became clear that many of the representations made by Defendant Mariner turned out to be false, incorrect, or misleading and that from the beginning Defendant Mariner acted in bad faith to defraud Plaintiffs of the book of business for

far less than it was worth.

51. It was clear that Mariner had no intent to honor the terms of the LOI, the APA, the Management Incentive, or the representations it made to induce Plaintiffs into the Transaction.

52. During the onboarding process, Mariner provided Plaintiff Hyre with a laptop computer.

53. Plaintiff Hyre provided Mariner with his old laptop computer that he had purchased ("Personal Laptop"), so that Mariner could port his information from onto the new device.

54. In providing Mariner with his Personal Laptop, Plaintiff Hyre specifically informed Mariner that he had personal information that he did not want to be transferred from the Personal Laptop to the Mariner Laptop.

55. Despite this, Mariner employee Barb Pruden informed Plaintiff Hyre that there was no time to do this and refused, and in the process of bringing all of the data from the Personal Laptop to the Mariner laptop Mariner wiped all of the data from Plaintiff Hyre's Personal Laptop.

56. The information that was removed from the Personal Laptop and ported onto the Mariner Laptop included volumes of sensitive personal information that is critical to Plaintiff Hyre's personal life, including documents related to Plaintiff Hyre's family and finances.

57. Following the Transaction closing, Plaintiff Hyre was working more than eighty (80) hours per week on Mariner matters despite being promised that he would be able to reduce his workload as a result of Mariner providing support.

58. This large workload stemmed from Mariner's representations about providing support for HPWA and allowing HPWA to operate client relationships autonomously being false.

59. HPWA's longstanding Chief Operating Officer Jen Ludowise quit shortly after the Transaction closed as a result of the chaotic, overburdensome work environment that Mariner's

lack of support created.

60. Many of Mariner's operating practices that were imposed on HPWA by Mariner — including bookkeeping practices and Mariner's lack of bulk trading software like that which HPWA had successfully used in the past —were badly outdated and required significant hours to accomplish what were formerly simple tasks for HPWA.

61. Mariner employee Brian O'Regan expressly and falsely represented to Plaintiffs that Mariner had access to bulk trading software when in fact Mariner did not have any such software.

62. Additionally — in direct contradiction of the terms of the LOI, APA, and the Transaction — Mariner intermeddled in Plaintiffs' management of HPWA's clients' assets by forcing Plaintiffs to push clients into Mariner investment models as opposed to Plaintiffs' own models that had long been used to manage client assets.

63. In an attempt to assist with the massive workload generated by Ms. Ludowise's departure and Mariner's incompetence or unwillingness to assist Plaintiffs with a smooth transition, Plaintiff Hyre attempted to hire an additional advisor.

64. However, Mariner prevented Plaintiff Hyre from hiring the advisor, even though Plaintiffs had been promised that they would retain personnel hiring authority so long as they remain within an allotted budget and even though ample funds were available to make the hire.

65. Plaintiff Hyre had on three occasions requested to meet with Mariner's head of wealth management, Tony Roberts, to discuss Plaintiffs' concerns with Mariner, to no avail.

66. Plaintiffs' concerns included that Mariner had failed to initiate the client referrals as it had promised and represented and that Plaintiff Hyre was not permitted to run HPWA and the client relationships autonomously as was promised and represented.

67. With knowledge that Plaintiffs were frustrated with the misrepresentations made to Plaintiffs by Mariner — Bob Cole, Mariner's regional managing director, arranged to meet with Plaintiff Hyre about his concerns on October 27, 2025.

68. On October 26, 2025, Cole emailed Plaintiff Hyre stating that he would be bringing a human resources representative, Stacie Runion, to the meeting.

69. Cole indicated that he wanted to get Plaintiffs' perspective on the transaction and give Plaintiffs a chance to voice their concerns.

70. Unbeknownst to Plaintiff, the October 27, 2025 meeting was not a good-faith effort at working through Plaintiffs' concerns.

71. Rather, Mariner informed Plaintiff Hyre that he was being terminated without providing any explanation to Plaintiff Hyre and without providing any sort of improvement plan, warning, or prior notice to Plaintiff Hyre.

72. Plaintiff Hyre asked three times during the meeting why he was being terminated, and each time the Mariner employees did not provide Plaintiff Hyre with an explanation for why he was being terminated.

73. Runion stated that Mariner was willing to offer Plaintiff Hyre a severance, but that Mariner was unilaterally cancelling the Management Incentive — despite Mariner having no right to do so.

74. Immediately upon Plaintiff Hyre's termination, Mariner severed Plaintiff Hyre's access to Mariner's computer systems and took his Mariner laptop.

75. Plaintiff Hyre specifically informed Defendant Mariner employee Bob Cole on October 29, 2025, that he had personal information and data that Mariner had taken off of Plaintiff Hyre's Personal Laptop and that Plaintiff Hyre needed this information and data back.

76. Mariner offered to purchase Plaintiff Hyre's Mariner equity — then worth $28,000,000.00 — for $25,000,000.00 and submit a Form U5 status of "Permitted to Resign" in exchange for Plaintiff signing a broad release of his legal claims against Mariner.

77. By way of background, when a registered investment advisor separates from an investment firm, the firm files a public Form U5 filing.

78. The Form U5 is the official and public termination of the relationship between an advisor and the firm.

79. The Form U5 is a public facing document upon which clients and potential clients can evaluate advisors. Form U5s are very difficult to expunge and are effectively part of an advisor's 'permanent record'.

80. A negative reason for separation on a U5 can have devastating effects on an advisor's ability to work and obtain new clients.

81. A "Permitted to Resign" designation in a Form U5 strongly suggests that an advisor was fired from their former firm.

82. With longstanding clients trying to reach Plaintiff Hyre while Plaintiff Hyre was contemplating the severance offer, Plaintiff sought clarification from Cole on how to approach these clients.

83. Plaintiff Hyre followed Cole's directive by instructing his clients to reach out to Doug Ramsey, a Mariner advisor who had an established working relationship with Plaintiff Hyre.

84. Plaintiff Hyre came to learn that Mariner was telling HWPA clients that Plaintiff Hyre was having a difficult time having a boss and that the clients should not feel sympathy for Plaintiff Hyre because he has plenty of money.

85. Around 3:01 p.m. on October 29, 2025, Runion emailed Hyre to reiterate the terms

of the severance offer.

86. However, several hours later, Cole emailed Hyre and revoked Mariner's severance offer, and the offer to list "Permitted to Resign" on the U5.

87. Cole claimed that "Mariner [had] received reliable information that [Plaintiff] may have materially violated [his] post-separation obligations to Mariner" and further falsely accused Plaintiff Hyre of breaching his fiduciary duty to Mariner.

88. Plaintiff Hyre had done no such thing but was rather expressly telling HPWA clients to contact Mariner.

89. In the same email Cole informed Plaintiff Hyre that it was investigating this "reliable information[.]"

90. Over the next several weeks, Plaintiff Hyre's counsel sought answers from Mariner's counsel regarding the facts supporting the purported investigation into Plaintiff Hyre's alleged wrongdoing and the timeline for the investigation.

91. During the same time period Plaintiff Hyre repeatedly reached out to Mariner to obtain his personal information and data that were transferred to the Mariner laptop from his Personal Laptop.

92. Mariner employee Stacie Runion emailed Plaintiff Hyre that she would work with IT to help Plaintiff obtain his personal information, but this never occurred.

93. Finally, on November 25, 2025, at 6:50 p.m., Mariner's counsel, Chris Pace, provided a scattershot pretextual explanation for Plaintiff Hyre's termination.

94. Mariner's counsel confirmed that Mariner had not "identified material violations of Mr. Hyre's non-compete and non-solicitation obligations."

95. In other words, Mariner was unable to support its baseless allegation that Plaintiff

Hyre was preparing to compete with Mariner as was the purported reason for terminating Plaintiff employment and rescinding its severance offer.

96. With no evidence to support Plaintiff Hyre's termination, Mariner should have immediately rescinded the termination and allowed Plaintiff to continue working.

97. Instead, Mariner was determined get out of its $13,000,000.00 obligation to Plaintiff Hyre — an obligation that had materially induced Plaintiff to sell HPWA's assets to Mariner.

98. To do this, Mariner invented three new and after-the fact pretextual reasons to continue justifying Plaintiff Hyre's termination.

99. First, Mariner alleged that Plaintiff Hyre "was devoting substantial time to running a non-Mariner business from Mariner's facilities and on Mariner work times."

100. The supposed basis for this allegation was the presence of documents related to Plaintiff Hyre's personal investments in the HPWA office — an office that Plaintiff Hyre had worked out of for decades.

101. Outside of Mariner working hours, Plaintiff Hyre periodically checked his real estate investments as he had always done — activities disclosed and approved by Mariner as part of the Transaction. During Mariner Business hours, Plaintiff was focused exclusively on Mariner work.

102. These activities never materially detracted from Plaintiff Hyre's Mariner responsibilities, and he was never told his performance was inadequate or that he was not completing Mariner duties, quite the contrary: Plaintiff Hyre had taken on upwards of 80 hours per week Mariner as a result of Mariner failing to provide the support it promised.

103. The suggestion that the presence of documents related to Plaintiff Hyre's personal

investing activities somehow interfered with his Mariner obligations is unreasonable and factually unsupported.

104. The second pretextual basis Mariner provided for Plaintiff's termination was that "in violation of Mariner's policies, the company has located a number of bottles of alcohol in [Plaintiff Hyre's] office."

105. As an initial matter, Mariner employee Bob Cole had visited Plaintiff Hyre's office multiple times and saw the bottles as they were clearly displayed in the kitchen and nothing was ever mentioned by Mariner as those bottles being against company policy or otherwise problematic.

106. As is customary in the wealth advising industry — which relies heavily on established interpersonal advisor-client relationships — Plaintiff would occasionally offer clients alcoholic beverages. For example, Plaintiff HPWA held wine and bourbon tastings for clients which resulted in bottles being present in HPWA's office — bottles that Mariner employee Bob Cole would have seen prior during his visits to the HPWA office prior to the Transaction being completed.

107. Additionally, upon information and belief, several advisors in Mariner's 130+ offices have on occasion provided alcoholic beverages without suffering adverse employment consequences by Mariner.

108. In other words, terminating Plaintiff for something as customary as providing alcoholic beverages to clients in the wealth advising industry underscores the patently pretextual nature of this purported basis for Plaintiff's termination.

109. The third pretextual basis for Plaintiff's termination, Mariner alleged that Plaintiff Hyre negotiated an undisclosed side agreement between himself and former HPWA/current

Mariner employee named Phil Constans. Mariner stated that the existence of this alleged side agreement violated Plaintiff Hyre's duties to Mariner in several respects, including failure to disclose, failure to convey unencumbered assets, failure to identify key contracts or commitments, and breach of representations and warranties.

110. This purported basis for Plaintiff Hyre's termination is utterly false because not only was Mariner aware of an agreement between Plaintiff and Constans, Mariner employee Bob Cole directed Plaintiff Hyre to negotiate this agreement.

111. Constans was an older advisor and Mariner employee Bob Cole wanted to make room to hire a younger advisor who was motivated to bring in new business.

112. To accomplish this, Cole directed Plaintiff Hyre to induce Constans' retirement.

113. In turn, Plaintiff offered to pay Constans a severance using Plaintiff Hyre's personal funds.

114. In the same 6:20 p.m. November 25, 2025 email, after Mariner fabricated these pretextual reasons for terminating Plaintiff's employment in an attempt to defraud Plaintiff of the Management Incentive, Mariner's attorney stated that Plaintiff Hyre needed to agree to, among many other things, "terminate the Management Incentive as contemplated in the purchase agreement between Mariner and Mr. Hyre" by "mid-morning on November 26."

115. This extremely short deadline imposed by Mariner was purportedly for the reason that the U5 filing was due on November 26, 2025.

116. In an unmistakable display of the predatory, extortionate, and fraudulent character of Mariner's conduct toward Plaintiff Hyre, Mariner's attorney Chris Pace expressly linked what Mariner would list on the U5 to Plaintiff Hyre accepting the one-sided offer and foregoing his entitlement to the Management Incentive:

> U-5. The U-5 must be filed no later than tomorrow (11.26.25). In connection with the proposal terms below, Mariner is willing to identify the reason for Mr. Frye's (sic) separation as "Permitted to Resign. Failure to meet performance expectations unrelated to security work."

117. In other words, Mariner is now making a thinly veiled threat that it intends to — in violation of federal law — file a false Form U5 concerning the circumstances of Plaintiff Hyre's departure from Mariner, but will settle on a slightly less damaging (but no more true) Form U5 so long as Plaintiff Hyre plays ball and accepts the grossly one sided terms.

118. Mariner never filed the Form U5, which is highly indicative that Mariner knew it was false that Plaintiff Hyre was terminated for any legitimate reason and knew that to say otherwise in the Form U5 would constitute textbook defamation of Plaintiff Hyre by Mariner. In other words, Mariner was bluffing in a bad faith attempt to extort concessions from Plaintiff Hyre.

119. In sum, Mariner's post termination conduct toward Plaintiff Hyre powerfully illustrates the bad faith it has harbored from the inception of the Transaction. At no point regarding the Transaction has Mariner acted in good faith.

120. Mariner breached its promise to allow Plaintiffs to run the office autonomously.

121. Mariner breached its promise regarding the revenue Plaintiffs would earn for moving business to Mariner (i.e., that Plaintiff would earn a portion of the fees generated by HPWA business).

122. When Plaintiffs acted in good faith to resolve these concerns, Mariner summarily fired him.

123. In doing so, Mariner fabricated an allegation that Plaintiff Hyre was preparing to breach his non-solicitation and non-competition obligations to Mariner.

124. When an investigation conducted by Mariner's own counsel failed to reveal any

evidence supporting this allegation, Mariner remained determined to keep Plaintiffs' clients and not pay Plaintiff the $13,000,000.00 Management Incentive or any portion of fees generated by HPWA's book of business.

125. In an attempt to do this, Mariner accused Plaintiff of conducting personal business on Mariner property — despite that other Mariner advisors routinely engage in de minimis personal activity while on Mariner property.

126. Mariner accused Plaintiff of possessing alcohol in violation of Mariner policy — despite other Mariner offices also containing alcohol and/or serving alcohol at client events and despite Mariner having actual knowledge of Plaintiff HPWA's possession of these bottles prior to entering into the Transaction.

127. Mariner accused Plaintiff of surreptitiously engaging in a side deal — despite Mariner not only having full knowledge of this negotiation but Mariner itself having directed Plaintiff to engage in this negotiation with Mr. Constans.

128. There is no legal justification for Mariner's conduct.

129. Each step taken by Mariner was done with the intent of (1) defrauding Plaintiffs of HPWA's assets including the book of business (2) evading its obligations to Plaintiffs under the terms of the Transaction, and/or (3) unlawfully interfering with Plaintiffs' right to the Management Incentive.

130. Mariner has relied on flimsy pretextual justifications to avoid Plaintiff Hyre's continued employment and void Mariner's obligations to Plaintiffs including but not limited to Plaintiff Hyre's reasonable and justified expectations to receive the $13,000,000.00 Management Incentive and the over $1,500,000.00 in management fees that Plaintiff Hyre was represented and promised to receive annually after the Management Incentive was paid.

131. Mariner's conduct toward Plaintiffs complained of herein was and is willful, wanton, fraudulent, and/or malicious.

132. As a direct and proximate result of Mariner's conduct, Plaintiffs have suffered damages, including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

133. Among other damages, Plaintiff Hyre has refinancing obligations coming due on a number of personal real estate investments that he will not be able to meet without the income and profits he reasonably expected to receive as a result of the Transaction. These commercial loans were specifically disclosed to Mariner while the Transaction was being contemplated and Mariner employee Brian O'Regan assured Plaintiff Hyre that Plaintiff Hyre would easily receive over $1,500,000.00 in compensation per year from Mariner as a result of Plaintiff Hyre receiving a percentage of the fees generated by the HPWA business.

134. Plaintiff Hyre relied on this promise and representation to receive approval from his bank to sell HPWA, as his Mariner income prior to his receipt of the Management Incentive and the at least $1,500,000.00 in annual management fees was too low so as to constitute a breach of Plaintiff Hyre' covenant to the bank to maintain a minimum income level.

135. Based on Mariner's promises and representations, Plaintiff Hyre's bank approved Plaintiff Hyre to sell HPWA on the understanding that Plaintiff Hyre was going to receive a substantial annual income from Mariner following the payment of the Management Incentive.

136. It was foreseeable from Mariner's perspective that its failure to pay Plaintiff Hyre the Management Incentive and failure to annually pay Plaintiff Hyre a percentage of fees generated by HPWA would result in Plaintiff Hyre being unable to meet his borrowing obligations.

## COUNT I – BREACH OF CONTRACT

**By Plaintiffs Hyre and HPWA against Mariner**

137. Plaintiffs incorporate by reference all other paragraphs of this complaint as though fully set forth herein.

138. Plaintiffs and Mariner entered into a valid and enforceable contract for the sale of HPWA's assets to Defendant Mariner.

139. Plaintiffs performed under the contract by conveying HPWA's assets to Defendant Mariner.

140. A material term of the contract for the sale of HPWA's assets to Defendant Mariner was that Plaintiff would be entitled to the Management Incentive.

141. Nothing in the contact for the sale of HPWA to Defendant Mariner made Plaintiff's right to receive the Management Incentive contingent upon his continued employment with Mariner.

142. Mariner has unambiguously informed Plaintiff that it will not pay him the Management Incentive and has thereby breached its contract with Plaintiff.

143. Alternatively, if the Court determines that Plaintiff's entitlement to the Management Incentive was contingent upon Plaintiff's continued employment with Mariner, then Mariner and Plaintiff entered into a contract for employment for a term, and Mariner breached the contract by terminating Plaintiff without cause.

144. Mariner's breach of contract has directly and proximately caused Plaintiffs to suffer damages, including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

WHEREFORE, Plaintiffs pray for judgment against Defendant Mariner in a fair and just sum, for an award of compensatory damages in an amount to be proven at trial, prejudgment interest, postjudgment interest, costs, attorneys' fees, and for such other and further relief as the Court deems just and proper.

**COUNT II – FRAUD**

**By Plaintiffs Hyre and HPWA against Mariner**

145. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

146. Defendant Mariner made representations of material fact that were known to be false or untrue, or were recklessly made without knowledge concerning the representation in at least one or more of the following respects:

a. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

b. Defendant Mariner in the LOI represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

c. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiff Hyre would be able to continue to manage client relationships with autonomy;

d. Defendant Mariner in the LOI represented that Plaintiffs would be able to continue to manage client relationships with autonomy;

e. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiffs would have continued employment with

Defendant Mariner following HPWA's assets being conveyed to Defendant Mariner;

f. Defendant Mariner in the LOI represented that Plaintiff would have continued employment with Defendant Mariner following HPWA's assets being conveyed to Defendant Mariner;

g. Defendant Mariner through its agent and employee Brian O'Regan represented to Plaintiff Hyre that Mariner would pay Plaintiff Hyre 35% of annual fees generated by business brought over to Mariner by Plaintiffs and 25% of HPWA fees generated by Mariner referrals following Plaintiff Hyre's receipt of the Management Incentive;

h. Defendant Mariner through its agent and employee Brian O'Regan represented to Plaintiff Hyre that Plaintiff's compensation from fees at Mariner would increase to at least $1,500,000.00 annually following Plaintiff Hyre's receipt of the Management Incentive.

i. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiff Hyre would easily receive the full $13,000,000.00 Management Incentive;

j. Defendant Mariner represented that Mariner would help grow HWPA substantially through client referrals; and/or

k. Defendant Mariner represented to Plaintiffs in the LOI that Mariner was experienced in transitions of the type contemplated by the Transaction and that the transition of HPWA into a Mariner office would be a smooth transition.

147. Each of these representations were intentionally made for the purpose of inducing Plaintiffs to act on them.

148. Plaintiffs reasonably relied and acted upon these representations by, among other things, entering into the Transaction and foregoing the sale of HPWA's assets to a different entity.

149. Defendant Mariner's fraud complained of herein proximately caused Plaintiff to sustain damages including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

WHEREFORE, Plaintiffs pray for judgment against Defendant Mariner in a fair and just sum, for an award of compensatory damages in an amount to be proven at trial, punitive damages, prejudgment interest, postjudgment interest, costs, attorneys' fees, and for such other and further relief as the Court deems just and proper.

## COUNT III – NEGLIGENT MISREPRESENTATION

**By Plaintiffs Hyre and HPWA against Defendant Mariner**

150. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

151. Defendant Mariner, in the course of its business, supplied false information for the guidance of Plaintiffs in Plaintiffs' business transactions in one or more of the following respects:

a. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

b. Defendant Mariner in the LOI represented that Plaintiff Hyre would be able to continue operating HPWA with autonomy;

c. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiff Hyre would be able to continue to manage client relationships with autonomy;

d. Defendant Mariner in the LOI represented that Plaintiffs would be able to continue to manage client relationships with autonomy;

e. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiffs would have continued employment with Defendant Mariner following HPWA's assets being conveyed to Defendant Mariner;

f. Defendant Mariner in the LOI represented that Plaintiff would have continued employment with Defendant Mariner following HPWA's assets being conveyed to Defendant Mariner;

g. Defendant Mariner through its agent and employee Brian O'Regan represented to Plaintiff Hyre that Mariner would pay Plaintiff Hyre 35% of annual fees generated by business brought over to Mariner by Plaintiffs and 25% of HPWA fees generated by Mariner referrals following Plaintiff Hyre's receipt of the Management Incentive;

h. Defendant Mariner through its agent and employee Brian O'Regan represented to Plaintiff Hyre that Plaintiff's compensation from fees at Mariner would increase to at least $1,500,000.00 annually following Plaintiff Hyre's receipt of the Management Incentive.

i. Defendant Mariner through its agent and employee Brian O'Regan represented that Plaintiff Hyre would easily receive the full $13,000,000.00

Management Incentive;

j. Defendant Mariner represented that Mariner would help grow HWPA substantially through client referrals; and/or

k. Defendant Mariner represented to Plaintiffs in the LOI that Mariner was experienced in transitions of the type contemplated by the Transaction and that the transition of HPWA into a Mariner office would be a smooth transition.

152. Defendant Mariner failed to exercise reasonable care or competence in obtaining this information and/or communicating this information to Plaintiffs.

153. Plaintiffs reasonably relied upon this information and were the ones for whose benefit and/or guidance this information was supplied.

154. As a result, Plaintiffs were proximately caused to suffer damages — including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage — in a transaction that Mariner intended to influence, namely the Transaction.

WHEREFORE, Plaintiffs pray for judgment against Defendant Mariner in a fair and just sum, for an award of compensatory damages in an amount to be proven at trial, punitive damages, prejudgment interest, postjudgment interest, costs, attorneys' fees, and for such other and further relief as the Court deems just and proper.

**<u>COUNT IV – KANSAS UNIFORM TRADE SECRETS ACT</u>**

**By Plaintiffs Hyre and HPWA against Mariner**

155. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

156. K.S.A. § 60-3322(a), dealing with misappropriation of trade secrets, provides that a "complainant is entitled to recover damages for misappropriation."

157. Defendant Mariner, through its misrepresentations, breach of contract, fraudulent conduct, and tortious conduct complained of herein, used improper means to misappropriate trade secrets within the meaning of the Kansas Uniform Trade Secrets Act, K.S.A. § 60-3320, et seq.

158. Specifically, Plaintiffs' book of business constituted a "[t]rade secret" within the meaning of K.S.A. § 60-3320.

159. Defendant Mariner knew or had reason to know that the acquisition of the book of business was acquired by improper means.

160. Defendant Mariner willfully and maliciously misappropriated the book of business through its knowing, intentional, fraudulent, and/or tortious conduct complained of herein.

161. As a result, Plaintiffs were proximately caused to suffer damages — including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage — in a transaction that Mariner intended to influence, namely the Transaction.

WHEREFORE, Plaintiffs pray for judgment against Defendant Mariner in a fair and just sum, for an award of compensatory damages in an amount to be proven at trial, punitive damages, prejudgment interest, postjudgment interest, costs, attorneys' fees, for all damages recoverable under the Kansas Uniform Trade Secrets Act, and for such other and further relief as the Court deems just and proper.

## COUNT V – DEFEND TRADE SECRETS ACT

**By Plaintiffs Hyre and HPWA against Mariner**

162. Plaintiffs incorporate by reference all other allegations contained in this complaint

as though fully set forth herein.

163. 18 U.S.C. § 1836(b)(1) provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

164. Defendant Mariner through its misrepresentations, breach of contract, fraudulent conduct, and tortious conduct complained of herein, misappropriated trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

165. Specifically, Plaintiffs' book of business constituted a "trade secret" within the meaning of 18 U.S.C. 1839(3).

166. Defendant Mariner knew or had reason to know that the acquisition of the book of business was acquired by improper means.

167. Defendant Mariner willfully and maliciously misappropriated the book of business through its knowing, intentional, fraudulent, and/or tortious conduct complained of herein, and thus exemplary damages are warranted under 18 U.S.C. § 1836(b)(3)(C).

168. As a result, Plaintiffs were proximately caused to suffer damages — including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage — in a transaction that Mariner intended to influence, namely the Transaction.

WHEREFORE, Plaintiffs pray for judgment against Defendant Mariner in a fair and just sum, for an award of compensatory damages in an amount to be proven at trial, punitive damages, prejudgment interest, postjudgment interest, costs, attorneys' fees, for all damages recoverable under the Defend Trade Secrets Act, and for such other and further relief as the Court deems just and proper.

## COUNT VI – COMPUTER FRAUD AND ABUSE ACT

**By Plaintiff Hyre against Mariner**

169. Plaintiff Hyre incorporates by reference all other allegations contained in this complaint as though fully set forth herein.

170. 18 U.S.C. § 1030(g) provides in part that "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

171. Plaintiff's Personal Laptop constitutes both a "computer" and a "protected computer" within the meaning of 18 U.S.C. § 1030.

172. Defendant Mariner intentionally accessed the Personal Laptop without authorization and/or exceeded authorized access within the meaning of § 1030(a)(2) and thereby obtained information contained in a financial record of a financial institution within the meaning of §1030(a)(2)(A).

173. Defendant Mariner intentionally accessed the Personal Laptop without authorization and/or exceeded authorized access within the meaning of § 1030(a)(2) and thereby obtained information from a protected computer within the meaning of §1030(a)(2)(C).

174. Defendant Mariner knowingly and with intent to defraud accessed the Personal Laptop without authorization and/or exceeded authorized access and by means of such conduct furthered the intended fraud and obtained things of value, thereby violating §1030(a)(4).

175. Defendant Mariner's violation(s) of 18 U.S.C. § 1030 caused loss to Plaintiff in excess of $5,000.00 within the meaning of § 1030(4)(A)(i)(I), including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

WHEREFORE, Plaintiff Hyre prays for judgment against Defendant Mariner in a fair and just sum, for an award of compensatory damages in an amount to be proven at trial, punitive damages, prejudgment interest, postjudgment interest, costs, attorneys' fees, and for such other and further relief as the Court deems just and proper.

**COUNT VII – CONVERSION**

**By Plaintiff Hyre against Mariner**

176. Plaintiff Hyre incorporates by reference all other allegations contained in this complaint as though fully set forth herein.

177. In wiping all of the data from Plaintiff Hyre's Personal Laptop in the process of downloading the same without Plaintiff Hyre's consent, Defendant Mariner assumed or exercised the right of ownership over the Personal Laptop and that data contained on it.

178. The Personal Laptop and Plaintiff Hyre's personal data that was wiped from it was Plaintiff Hyre's property.

179. Defendant Mariner's continued possession of Plaintiff Hyre's personal data contained on it is and was without authorization by Plaintiff Hyre.

180. Defendant Mariner's act of wiping all of the data from Plaintiff's Personal Laptop without Plaintiff Hyre's authorization has been to the exclusion of Plaintiff Hyre's rights to the Personal Laptop and the data contained on it.

181. As a proximate cause of Defendant Mariner's conversion of Plaintiff Hyre's Personal Laptop and the data contained on it, Plaintiff has suffered damages including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

WHEREFORE, Plaintiff Hyre prays for judgment against Defendant Mariner in a fair and

just sum, for an award of compensatory damages in an amount to be proven at trial, punitive damages, prejudgment interest, postjudgment interest, costs, attorneys' fees, and for such other and further relief as the Court deems just and proper.

**COUNT VIII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIP**

**By Plaintiffs Hyre and HPWA against Mariner**

182. Plaintiffs incorporate by reference all other allegations contained in this complaint as though fully set forth herein.

183. Plaintiffs had an existing business relationship with the clients of HPWA, i.e., the book of business.

184. At all relevant times, Defendant Mariner had knowledge of Plaintiffs' business relationship with Plaintiffs' clients.

185. But for the conduct of Defendant Mariner complained of herein, Plaintiffs were reasonably certain to have a continued a business relationship with Plaintiffs' clients.

186. Defendant Mariner intentionally, unlawfully, and fraudulently engaged in misconduct that interfered with Plaintiffs' business relationship with Plaintiffs' clients.

187. Defendant Mariner's misconduct directly and proximately caused Plaintiffs to suffer damages, including but not limited to monetary damages, lost income, lost profits, consequential damages, special damages, loss of goodwill, loss of client relationships, and loss of competitive advantage.

WHEREFORE, Plaintiffs pray for judgment against Defendant Mariner in a fair and just sum, for an award of compensatory damages in an amount to be proven at trial, punitive damages, prejudgment interest, postjudgment interest, costs, attorneys' fees, and for such other and further relief as the Court deems just and proper.

**COUNT IX – DECLARATORY JUDGMENT –**
**INVALIDITY OF NONCOMPETITION CLAUSE**

**By Plaintiffs Hyre and HPWA against Mariner**

188. Plaintiffs incorporate by reference all other allegations contained in this complaint as though set forth fully herein.

189. 28 U.S.C. § 2201(a) provides in relevant part that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought."

190. As a result of the Transaction, Plaintiffs have become subject to noncompetition obligations that prohibit Plaintiffs from competing with the business of Mariner.

191. Under Kansas law, noncompetition agreements are strictly construed against employers. *Weber v. Tillman*, 259 Kan. 457, 462 (1996). "A noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare." *Id.* Only "a legitimate business interest may be protected by a noncompetition covenant" and if "the sole purpose is to avoid ordinary competition, it is unreasonable and unenforceable." *Id*. (citing *Eastern Distributing Co. v. Flynn,* 222 Kan. 666, 670 (1977)). "The determination of reasonableness is made on the particular facts and circumstances of each case." *Weber*, 259 Kan. at 464. Relevant factors in accessing reasonableness include: "(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable?" *Id*.

192. Defendant Mariner has no legitimate business interest in the enforcement of noncompetition obligations against Plaintiffs because at all relevant times Defendant Mariner

intended to defraud Plaintiffs of the book of business and intended to avoid ordinary competition through use of the noncompetition agreement.

193. Plaintiff Hyre, having been defrauded of his life's work, and with no means to make a comparable income, is currently and will continue to be unduly burdened by the noncompetition agreement.

194. The noncompetition clause in the Asset Purchase Agreement is both territorially and temporarily overbroad: it is territorially unlimited and purports to prohibit Plaintiffs from competing with Mariner until May 1, 2030.

WHEREFORE, Plaintiffs pray for a declaratory judgment invalidating any noncompetition obligations that may have arisen out of the Transaction, for costs, attorneys' fees, and for such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

SANDBERG PHOENIX & VON GONTARD, P.C.

By *<u>/s/ W. Perry Brandt</u>*
W. Perry Brandt DKAN # 77842
Evan Rose KS # 30648
4600 Madison Avenue
Suite 1000
Kansas City, MO 64112
(816) 305-7377
pbrandt@sandbergphoenix.com
erose@sandbergphoenix.com

CARLILE PATCHEN & MURPHY, LLP

Matthew S. Brown *pro hac vice pending*
950 Goodale Blvd., Suite 200
Columbus, Ohio 43212
614.628.0877
MBrown@cpmlaw.com

*Attorneys for Plaintiffs*